UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESTON P. KHAOONE, AM2008,<br><br>Petitioner,<br><br>v.<br><br>STUART SHERMAN, Warden,<br><br>Respondent. | Case No. 17-cv-03884-CRB (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Petitioner Preston P. Khaoone, a state prisoner incarcerated at the Substance Abuse Treatment Facility and State Prison, Corcoran (SATF-CSP, Corcoran), seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a conviction from Sonoma County Superior Court. For the reasons that follow, the petition will be denied.

## BACKGROUND

A. <u>Statement of the Case</u>

Petitioner and defendants Sarith Prak, David Prak and Quentin Glenn Russell were charged with multiple felony counts, including active gang participation, kidnapping and first-degree murder. Special circumstances for murder during the commission of a kidnapping and gang-related murder were alleged, as were various firearm enhancements. It was further alleged that the crimes were committed in association with a criminal street gang.

The case was tried before two juries. Petitioner was tried alone ("green jury") and the other defendants were tried together ("blue jury"). Following a 44-day trial, the two juries found the four defendants guilty on all counts, and found the firearm enhancements and kidnapping special circumstances true as to each. The green jury found the gang special circumstance true as to petitioner, while the blue jury found it not true as to the other defendants.

On July 27, 2012, the trial court sentenced each defendant to a term of life without parole, plus consecutive terms of 25 years for the firearm enhancement on count one, and two years on count two. The court stayed the term on count three. Petitioner and the other defendants appealed.

On January 6, 2017, the California Court of Appeal affirmed the convictions, but modified the sentences to eliminate the two-year term on count two. On April 12, 2017, the Supreme Court of California denied review.

On July 10, 2017, petitioner filed the instant federal petition for a writ of habeas corpus under § 2254. On September 12, 2017, the court (Cousins, M.J.) found that the petition appears to state five cognizable claims for relief under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent instead filed a motion to dismiss for failure to exhaust two of the five claims. Petitioner conceded that he did not exhaust two of the five claims and asked that the court delete them so he can proceed with his three exhausted claims.

On November 7, 2017, after the case was reassigned to the undersigned, the court struck petitioner's two unexhausted claims and ordered respondent to show cause why a writ of habeas corpus should not be granted on petitioner's three exhausted claims. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

B.  Statement of the Facts

The California Court of Appeal summarized the evidence presented at trial as follows:

> *A.  Murder of Vutha Au*
>
> Vutha Au was shot nine times and killed in the early morning hours of March 2, 2008. Earlier in the evening, Vutha, Tyrone Tay, and another man, described as Witness 2, had left a party in Sonoma County and were planning to go "clubbing." Just before midnight, Tay, who was driving, received text messages from Boonlack Chanpheng, an Asian Boyz gang member. Chanpheng told Tay that [petitioner] had been looking for Vutha, that Vutha has "gots 2 go," [sic] and that they were going to "fuc hm up." [sic] Chanpheng then placed brief calls to the phones associated with [petitioner] and David Prak, who were at another gathering. Chanpheng then texted Tay and told Tay to drive Vutha to a location outside a pool hall in downtown Santa Rosa. Tay complied.
>
> Although there was no direct trial testimony as to what occurred when Tay arrived at the pool hall, Witness 2 made out-of-

2

court statements that were admitted in evidence, stating that he tried to protect Vutha when a group that he did not identify took Vutha. Witness 4, Witness 2's brother-in-law, told a detective that early in the morning of March 2, 2008, Witness 2 phoned him and said, "They got Vutha." Witness 2 did not indicate who "they" were. Witness 2 had a visible bruise near his eye that morning.

At approximately 1:00 a.m. on March 2, 2008 (or about an hour after the last text message between Tay and Chanpheng), Park Ranger Jeremy Stinson was on patrol on Highway 1, driving toward Blind Beach. When he was about 250 yards from Blind Beach, he passed a dark sedan going the opposite way. Stinson continued to Blind Beach where he found Vutha on the ground, with a pool of blood around his head. Stinson checked to see if Vutha had a pulse and found that he did not have one. Stinson contacted dispatch and provided a description of the car he had seen.

In response to the information Stinson transmitted to dispatch, a deputy proceeded along Highway 116 to Blind Beach. There, he saw a blue Honda going the opposite way, and turned around and followed it. He stopped the car on Highway 116 near Crescent Avenue, about 10 miles from Blind Beach. Once they arrived, the deputies arrested [petitioner], who had been driving, Russell, who was in the passenger seat, and the Praks, who were in the back seat.

A detective brought Ranger Stinson to the scene of the car stop. He recognized the car by its tail lights. Another park ranger drove along Highway 1 toward Blind Beach at that time, and did not see any other cars on the road.

At Blind Beach, deputies found 17 shell casings near Vutha's body. All the casings were consistent with being fired from the same gun. Vutha's shirt had been pulled up around his neck. Vutha's shoes and socks were on the ground close to his body, along with three dimes.

Deputies later searched the area between Monte Rio at F Street, the parking lot and Highway 116, the site of the car stop. About 7 miles from the parking lot, on the side of the road they found a shirt and gloves. The shirt contained DNA that matched a sample provided by Russell. They also found Vutha's car keys about 8.5 miles along the route. About 1.5 miles from the parking lot, deputies found a 9 millimeter Glock and an empty magazine that was designed to hold 18 rounds.

*B.     Gang Evidence*

A gang expert, Detective Gregory Wojcik, testified that Asian Boyz was a Crip gang that used the letters ABZ and claimed the corresponding numbers of 1, 2, and 26, or 1226. While being Asian was not a prerequisite to membership, most members in Santa Rosa were Cambodian or Laotian. Detective Wojcik testified that the primary activities of the Asian Boyz were murder, kidnapping, drug sales, firearm possession, burglary, vehicle theft, and assaults on rival gang members. Detective Wojcik further opined that Asian

3

Boyz members would only commit serious crimes with people they trust. Violent crimes benefit the gang and its members by adding to fear and respect.

Numerous law enforcement witnesses testified that all four defendants were active members of Asian Boyz. They based this opinion on the presence of tattoos, prior contacts with defendants, and admissions defendants had made. A gang expert, Detective Brandon Cutting, also identified Boonlack Chanpheng as an active Asian Boyz member. Chanpheng was known as "short" or "little shorty." [Petitioner] went by the moniker "Crippin," while Sarith Prak went by "little cuzz," and David Prak went by "canine."

*C.     Offenses Against Terry Au*

Terry Au, Vutha's younger brother, testified that he sold marijuana and methamphetamine for Peter Khaoone, [petitioner] Preston Khaoone's brother. Terry stopped selling drugs after Peter was arrested during a traffic stop. After the arrest, Preston accused Terry of snitching on Peter. Terry agreed to continue selling drugs for Peter because he was concerned that they had accused him of being a snitch. He stopped selling drugs at the beginning of 2007. Perry Khaoone, another brother, then told Terry he wanted him to sell more drugs and that Terry owed him money. At first, Perry demanded $200, and then he demanded $1,000. Terry agreed to pay these amounts because he was afraid.

On several occasions, Perry and others would come to Terry's house and take things. Terry described one occasion when Perry, his brother Pongsony Khaoone, and another person invaded his house. Perry struck him with a gun and others held him at knife point. They forced Terry to go with them in their car. When they arrived at their destination, Terry was beaten, kicked, punched, burned, and choked. Perry threatened to cut off his fingers, and said he wanted $1,000 for each finger. Perry tried to hack off a finger with a garden tool, but Terry was able to pull away. Perry called Vutha, and told him that he needed to bring them $5,000 if he wanted to see Terry again. Terry was with them for five hours before an unidentified woman came and took him to a drop off point, from which he walked home.

Perry, Pongsony, and Boonlack Phanchanh [Fn.] were charged with numerous offenses, including kidnapping (§§ 209, subd. (a), 207, subd. (a)), robbery (§ 211), burglary (§ 459), as well as gang enhancements (§ 186.22, subd. (a)). Subsequently, Perry, Pongsony, and Boonlack pled guilty to kidnapping Terry and admitted the gang allegations; Perry also pled guilty to possessing methamphetamine with intent to sell. The remaining charges were dismissed.

> [Fn.] This appears to be a typographical error in the record regarding the spelling of Boonlack Chanpheng's last name.

After testifying against Perry, Pongsony, and Boonlack at the preliminary hearing, Terry was moved out of Sonoma County, along with his father, brother Vutha, and a niece, in a witness relocation

4

program. Following the relocation, Terry did not return to Sonoma County; however, his brother Vutha did go back against Terry's wishes.

### D. Evidence Limited to the Green Jury

Witness 8 was an in-custody informant who testified in exchange for a reduction of his sentence. Witness 8 said he met [petitioner] in 2006, when Witness 8 had purchased the drug Ecstasy for him to sell. However, gang expert Detective Cutting explained that although [petitioner] was on probation in 2006, there was no information that he sold drugs at that time. There was also no evidence that [petitioner] had any prior contacts with Witness 8.

Witness 8 testified that he spoke with [petitioner] in June or July of 2008, while they both were in custody in the Sonoma County jail. According to Witness 8, [petitioner] told him that there was a separate case where a witness was going to testify against his brother, and that [petitioner] had the witness killed. [Petitioner] gave Witness 8 two versions of Vutha's murder. In one version, [petitioner] said he got Vutha to go to a party where he and three other people, described as two brothers and a Native American, later identified as co-defendant Russell, were in attendance. When Vutha arrived, [petitioner] and the three others "snatched" him and forced him into a car. In the other version, [petitioner] said that he and the three other people were waiting for a phone call from Boonlack Chanpheng, an "older homie." When the group received the call from the "older homie" they went to a meeting point and "snatched" the witness. In both versions, [petitioner] said that he and his group used a blue Honda Accord that did not belong to him.

According to Witness 8, [petitioner] told the brothers to blindfold and gag Vutha with a sock. [Fn.] When they reached a parking lot in Bodega Bay, [petitioner] pulled out his .9 millimeter gun and gave it to Russell. Russell was reluctant to shoot, but [petitioner] told him to "'stop acting like a bitch and handle that.'" Russell "'emptied the clip'" firing 18 shots at Vutha. [Petitioner] retrieved the gun, wiped off the prints, and then threw it in the ocean. As they were leaving the parking lot, a park ranger pulled them over. [Petitioner] told everyone to say they were returning from a party in Bodega Bay.

[Fn.] A test of the socks that were recovered did not reveal any evidence of saliva.

Witness 8 admitted that he had read newspaper accounts of the crime. Initially, he was unsure whether he had learned certain details of the crime from those accounts. Specifically, he was unable to recall if [petitioner] had told him about throwing the gun in the ocean, or if he had read about it in the newspaper. However, after a lunch break and having his recollection refreshed with his prior testimony, Witness 8 maintained that [petitioner] did not specifically tell him that he threw the gun in the ocean. Rather, [petitioner] told him that the police found the gun used for the shooting in the ocean in Bodega Bay. Witness 8 further claimed that he did not tell police anything based on what he had read in the newspaper.

5

/

/

*E. Defense*

  The defense did not present an affirmative case. However, without objection, the defense marked as exhibits 12 articles from the Santa Rosa Press-Democrat during closing argument. Defense counsel utilized the exhibits as part of her argument that Witness 8 fabricated his account, and obtained case information from either the newspaper or talking with someone else.

  David Prak also presented evidence of positive behavior during and after his probation in connection with a prior offense.

People v. Prak, No. A136146, slip op. at 2-7 (Cal. Ct. App. Jan. 6, 2017) (ECF No. 20-11) (footnotes omitted except where noted).

## DISCUSSION

A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

B. Claims

Petitioner seeks federal habeas relief under § 2254 on three claims: (1) the trial court's exclusion of witness testimony under California's marital communications privilege violated petitioner's federal rights to present a defense, and to confront/cross-examine witnesses; (2) the trial court's instruction on aiding and abetting violated petitioner's federal right to due process; and (3) the trial court's instruction on conspiracy violated petitioner's federal right to due process.

1. Exclusion of Witness Testimony Based on Marital Privilege

Petitioner claims the trial court violated his federal constitutional rights to present a defense and to confront/cross-examine witnesses by applying California's marital communications privilege to exclude testimony that Witness 2 told his wife (Witness 3) that Vutha got into the Honda voluntarily. Petitioner contends this testimony was needed to refute the implication that Vutha was kidnapped and defend against the kidnapping and felony murder charges, as well as the kidnapping special circumstance. The claim is without merit.

The California Court of Appeal summarized the pertinent facts as follows:

> At trial, evidence was presented that Witness 2 had been with Vutha shortly before Vutha was killed. Witness 2 considered Vutha to be a "real friend." But while testifying, Witness 2 claimed a complete lack of memory regarding whether he was with Vutha or Tyrone Tay on the night of Vutha's murder. Witness 2, along with his wife (Witness 3) and his brother-in-law (Witness 4), who also

7

claimed memory loss, were declared evasive witnesses by the trial court.

The prosecutor elicited evidence that Witness 2 phoned Witness 4 at 12:22 a.m. on March 2, 2008, and said, "'They got Vutha.'" The prosecutor also sought admission of Witness 3's statements made during a police interview. In this interview, Witness 3 said that Witness 2 came home at 2:30 a.m. on March 2, 2008, with a bruise near his right eye, and told her, "They took Vutha." Witness 3 told the police that Witness 2 said he was hit while "they were grabbing Vutha." One of the investigators asked Witness 3 if her husband ever explained anything to her about the "circumstances of when Vutha was taken" from the car. Referencing a conversation she had with him after Vutha's funeral, Witness 3 replied: "No . . . [¶] All he kn[ew] he just woke up, and they were standing right there, and they told him to get up and they told them to get out of the car, and they said go home . . . and he said no, no . . . . And he said Vutha wanted to go, you know, out and talk to those guys one-on-one, and [Witness 2] said, no. And then I guess [Vutha] got out."

Appointed counsel for Witness 2 asserted the marital communications privilege, seeking to bar the statements Witness 2 allegedly made to Witness 3 regarding the facts of this case. The trial court ruled that the marital privilege applied.

People v. Prak, slip op. at 7-8.

The California Court of Appeal found that Witness 2's statements to Witness 3 were inadmissible under California's marital communications privilege law and that Witness 2 did not waive the privilege. Id. at 10-14. It also rejected petitioner's claim that application of the privilege violated several constitutional rights afforded to criminal defendants:

First, defendants argue that exclusion of the statements violated their right to confront and cross-examine witnesses. The federal and state constitutions guarantee criminal defendants the right to confront the prosecution's witnesses. (*Davis v. Alaska* (1974) 415 U.S. 308, 315; *People v Chavez* (1980) 26 Cal.3d 334, 353.) "'However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citation.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1051.) Here, the trial court could easily conclude that Witness 2's statements to Witness 3 had little relevance. Witness 2's statement to Witness 3 that "They took Vutha" was duplicative of his statement to Witness 4 that "They got Vutha." And the inference

defendants urge us to draw from Witness 2's statement that Vutha wanted to talk to his assailants is speculative and unfounded. It does not show that Vutha consented to being taken to Blind Beach but, at most, shows he wanted to talk to his assailants before he was taken by them.

Next, defendants argue that exclusion of Witness 2's statements to Witness 3 violated his right to present a complete defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id.* at p. 1103.) Defendants were not completely precluded from presenting evidence that Vutha agreed to go to Blind Beach with his assailants. Significantly, they presented evidence that Vutha was acquainted with the Asian Boyz and socialized with them prior to the attack on his brother Terry. They also presented evidence showing that even after the attack on Terry, Vutha had met with defendant Khaoone [(i.e., petitioner)] voluntarily to discuss problems their families were having. Defendants' inability to present additional, speculative evidence did not violate their right to present a defense.

Finally, defendants claim their right to compulsory process of witnesses was violated when the trial court excluded Witness 2's statements to Witness 3. Defendants, however, have not explained how they were prevented from calling any witnesses on their own behalf, which is the right protected by the compulsory process clauses of the federal and state constitutions. (*People v. Jacinto* (2010) 49 Cal.4th 263, 268-269.) Their focus is on the admission of out-of-court statements made by a witness and, as we explained, the trial court's exclusion of that evidence did not violate defendants' rights to confront witnesses or present a defense.

. . . .

Even if we were to conclude the trial court erred in excluding Witness 2's statements to Witness 3, we would find the error harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

Defendants claim that Witness 2's statement that he wanted to exit the car and talk to his assailants was "of huge importance, and its exclusion was devastating" to their defense because it showed Vutha voluntarily accompanied his assailants to Blind Beach. Without the statement, defendants claim they "had little to directly refute the charge of kidnapping—and with kidnapping came felony-murder based on kidnapping plus a kidnapping special circumstance." But, as discussed, Witness 2's statement that Vutha exited the car to talk to his assailants cannot reasonably be construed to mean that Vutha voluntarily accompanied his assailants to Blind Beach. This is particularly true when Witness 2's statements to

9

> Witness 3 are considered in their entirety. In addition to his statement that Vutha wanted to talk to the assailants, Witness 2 also told Witness 3 that the assailants demanded Vutha exit the car, and that he cautioned Vutha not to leave the car. Witness 2 also told Witness 3 that when Vutha exited the car, there was an ensuing struggle in which the assailants grabbed Vutha, and that Witness 2 was trying to protect Vutha. When Witness 2 returned home approximately two hours after the incident, Witness 3 observed that Witness 2 was crying and had a bruise around his eye. Considered in this context, Witness 2's statements to Witness 3 indicate that the assailants demanded that Vutha exit the car, that Vutha yielded to the demands despite Witness 2's warnings, and that after a struggle, the assailants took Vutha without his consent.
>
> An abundance of other evidence also showed that Vutha did not consent to being taken to Blind Beach by his assailants. After Terry testified against the Khaoone brothers at a preliminary hearing, Vutha, Terry, and other family members were moved out of Sonoma County as part of a witness relocation program. Although Vutha would return to Sonoma County on his own volition, it is unlikely that the jury would believe he accompanied defendant Khaoone and three other Asian Boyz members to a remote beach in the early hours of the morning. Indeed, the evidence from Blind Beach and nearby indicated that Vutha was taken there against his wishes. His shirt was torn and pulled up around his neck, his shoes and socks were removed, and his keys were found almost 10 miles from Blind Beach. This evidence belies any assertion that Vutha agreed to go to Blind Beach.[Fn.]
>
> [Fn.] As against defendant Khaoone, there was additional evidence showing a lack of consent via the testimony of Witness 8, who explained that Khaoone recounted how he and three other people "snatched" Vutha, blindfolded and gagged him, then took him to Bodega Bay.
>
> In sum, even if the trial court erred in excluding Witness 2's statements to Witness 3, it is not reasonably probable that a result more favorable to defendants would have been reached absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) The error also would have been harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at pp. 23-24.)

People v. Prak, slip op. at 15-17 (footnote in original).

The California Court of Appeal's rejection of petitioner's federal constitutional claims was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

It is well established that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683 690 (1986)), and "an opportunity for effective cross-

examination," Delaware v. Fensterer, 474 U.S. 15, 20 (1985). But neither right is absolute. There is no requirement "that a defendant must be allowed to put on any evidence he chooses," LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998), or to cross-examination "that is effective in every way, and to whatever extent, the defense might wish," Fensterer, 474 U.S. at 20. States have "broad latitude" to establish rules excluding evidence from criminal trials so long as the rules "are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" United States v. Scheffer, 523 U.S. 303, 308 (1998) (citations omitted), and trial courts retain "wide latitude" to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," Fensterer, 474 U.S. at 20.

A violation of the constitutional right to a meaningful opportunity to present a complete defense, or of the constitutional right to an opportunity to cross-examine witnesses, is not enough for federal habeas relief under § 2254. State prisoners seeking federal habeas relief are not entitled to relief unless the constitutional trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, federal habeas relief is limited to constitutional error that resulted in "actual prejudice." Id. (citation omitted).

Here, the California Court of Appeal reasonably determined that the excluded statement did not show that Vutha consented to go to Blind Beach. The statement – "And he said Vutha wanted to go, you know, out and talk to those guys one-on-one" – may show that Vutha voluntarily exited the car to talk to petitioner and his accomplices. But it cannot reasonably be construed also to show that Vutha agreed to go to a beach several miles away in the middle of the night. The California Court of Appeal's determination that the excluded statement was unfounded and speculative on the issue of consent, and therefore did not violate petitioner's constitutional rights to present a complete defense or to cross-examine witnesses, was not objectively unreasonable. Cf. Walters v. McCormick, 122 F.3d 1172, 1177 (9th Cir. 1997) (exclusion of tangential, non-probative evidence did not violate due process).

The California Court of Appeal also reasonably determined that any error was harmless

11

beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967). If a state court finds an error harmless, federal habeas relief is not available for the error "unless the state court's harmlessness determination itself was unreasonable." Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (citation omitted). In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." Id. (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). That cannot be said here because, in view of the speculative nature of the excluded statement and other evidence showing that Vutha did not consent to being taken to Blind Beach by petitioner and his accomplices (including Witness 8's testimony that petitioner recounted how he and three others "snatched" Vutha, blindfolded and gagged him, then took him to Bodega Bay), a reasonable jury could have found that Vutha did not consent to being taken to Blind Beach. Accord Rademaker v. Paramo, 835 F.3d 1018, 1020-24 (9th Cir. 2016) (California Court of Appeal's determination that instructional error regarding element of asportation was harmless beyond a reasonable doubt was not an objectively unreasonable application of Chapman because the evidence supported jury's finding that petitioner carried victim a "substantial distance" under either definition of asportation).

Petitioner is not entitled to federal habeas relief on his claim that the trial court's exclusion of witness testimony under California's marital communications privilege violated his federal rights to present a defense and to confront/cross-examine witnesses. See 28 U.S.C. § 2254(d).

2. Instruction on Aiding and Abetting

Petitioner claims the trial court's instruction on aiding and abetting, one of the alternative theories on which the jury could have convicted him of first degree murder as an aider and abettor of a target offense (aggravated assault), the natural and probable consequence of which was homicide, was a legally incorrect theory of first degree murder under California law. Petitioner bases his claim on People v. Chiu, 59 Cal. 4th 155 (2014), a case decided after his trial and in which the Supreme Court of California held that an aider and abettor cannot be convicted of first degree murder solely on a finding that the murder was a reasonably foreseeable consequence of the offense the aider and abettor intended to facilitate. A conviction for first degree murder of

12

an aider and abettor instead must be based on direct facilitation or on the application of the felony murder rule. 59 Cal. 4th at 166-67. Petitioner's claim is without merit.

The California Court of Appeal explained that the trial court had instructed both juries on three theories of first degree murder: "(1) premeditated and deliberated murder; (2) natural and probable consequences, based on a target crime of assault with force likely to produce great bodily injury; and (3) felony murder, with a predicate felony of kidnapping." People v. Prak, slip op. at 18. But the court did not address whether the instruction on aiding and abetting (i.e., theory (2)) was incorrect under California law because it could ascertain from the record that the jury returned its verdict on the correct theory of felony murder. The court explained:

> We need not determine the merits of defendants' arguments because even if defendants are correct, any error in the challenged instructions would be harmless. When a trial court instructs a jury on multiple theories of guilt, one of which was legally correct and the other(s) legally incorrect, reversal is not required if there is a basis in the record to find that the verdict was based on the valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129.) Here, it is clear that the first-degree `murder convictions were based on the felony murder theory. The jury convicted defendants of kidnapping. It also found true the special circumstance of intentional murder while engaged in the commission of a kidnapping. Once the jury convicted defendants of kidnapping and found true the special circumstance, a felony murder conviction was essentially automatic. (See § 189 [listing kidnapping as predicate crime of first-degree felony murder]; *People v. Chun* (2009) 45 Cal.4th 1172, 1182 ("First degree felony murder is a killing during the course of a felony specified in section 189[.]") As such, any errors relating to instructions on the other theories of murder were not prejudicial.

People v. Prak, slip op. at 18-19.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

It is well established that a conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one. Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008). But such instructional error is not structural and instead is subject to harmless-error review. Id. at 58, 60-61. And where, as here, a state court finds the error harmless, federal habeas relief is not available for the error "unless the state court's harmlessness determination itself was unreasonable." Davis, 135 S. Ct. at 2199 (citation omitted).

13

Here, the California Court of Appeal reasonably determined that any error relating to instructions on a theory of first degree murder other than felony murder were not prejudicial. The court reasoned that the jury's finding that the special circumstance of intentional murder while engaged in the commission of a kidnapping was true showed that the jury unanimously agreed on the correct theory of felony murder as the basis for its first degree murder conviction. Any error relating to the instruction on an incorrect aiding and abetting theory consequently was harmless or not prejudicial. The state court's determination that the special circumstance finding militated in favor of harmlessness was reasonable. Accord Pulido v. Chrones, 629 F.3d 1007, 1016-17 (9th Cir. 2010) (finding no prejudice where language of special-circumstance verdict form showed jury made requisite finding that was ambiguous from jury instructions). And the additional jury finding that the special circumstance of gang-related murder was true as to petitioner shows that the jury concluded that petitioner intended to kill Vutha, and further supports the conclusion that the California Court of Appeal reasonably determined that the jury did not based its first degree murder verdict as to petitioner on an incorrect theory.

Petitioner is not entitled to federal habeas relief on his claim that the trial court's instruction on aiding and abetting violated his federal right to due process. See 28 U.S.C. § 2254(d).

3. Instruction on Conspiracy

Petitioner claims the trial court's instruction on an uncharged conspiracy to commit assault with force likely to produce great bodily injury or murder violated his federal right to due process. Petitioner contends the instruction was defective because it allowed the jury to convict him of first degree murder without finding the murder was a natural and probable consequence of an assault with force likely to produce great bodily injury. The claim is without merit.

The California Court of Appeal considered the conspiracy instructional error claim with the aiding and abetting instructional error claim discussed above, and concluded that any error was harmless because the jury's first degree murder verdict was based on a correct felony murder theory. People v. Prak, slip op. at 18-19. Consequently, "any errors relating to instructions on [any] other theories of murder were not prejudicial." Id. at 19. This court found the state court's harmlessness determination reasonable in connection with petitioner's aiding and abetting

14

instructional error claim because it's supported by the jury finding true as to petitioner (1) the special circumstance of intentional murder while engaged in the commission of a kidnapping and (2) the special circumstance of gang-related murder. Petitioner sets forth no reason why the state court's harmlessness determination should be viewed differently in connection with his conspiracy instructional error claim, much less considered unreasonable under Davis. See 135 S. Ct. at 2199.

Petitioner is not entitled to federal habeas relief on his claim that the trial court's instruction on conspiracy violated his federal right to due process. See 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. And pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because it cannot be said that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS SO ORDERED**.

Dated: March 16, 2018

CHARLES R. BREYER
United States District Judge